## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY and NORFOLK SOUTHERN CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>NAUTILUS INSURANCE COMPANY and NATIONAL SALVAGE & SERVICE CORPORATION<br><br>Defendants. | **Civil Action No.:** |

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

PLAINTIFFS Norfolk Southern Railway Company ("Norfolk Southern") and Norfolk Southern Corporation ("NSC"), for their Complaint against DEFENDANTS Nautilus Insurance Company ("Nautilus") and National Salvage & Service Corporation ("National Salvage"), state the following:

1.      Norfolk Southern brings this action against its insurance carrier, Nautilus, and its contractual indemnitor, National Salvage, for defense, indemnification, and/or reimbursement obligations each independently owes Norfolk Southern as a result of a tort suit by the Estate of Kolton Helbert, *The Estate of Kolton Helbert v. Norfolk Southern Railway Co. and Nordco, Inc.* (Case No. 00231) (Ct. Cmmn. Pleas, Phila. Cty.) (the "*Helbert* Lawsuit").

2.      NSC brings this action against its contractual indemnitor, National Salvage, for defense, indemnification, and/or reimbursement obligations National Salvage owes to NSC as a result of the *Helbert* Lawsuit.

3.      The *Helbert* Lawsuit alleges that Mr. Helbert, an employee of National Salvage who was working with other National Salvage employees and a Norfolk Southern repair crew, was struck and killed by rail-mounted equipment operated by a Norfolk Southern employee.

4.      Nautilus, in derogation of its contractual and common law duties, has wrongly denied Norfolk Southern's claims for defense and indemnification under the Nautilus Insurance Company insurance policy, policy no. ECP202652813 ("Policy"), by disregarding information provided to it by its insured and by asserting improper constructions of its Policy's language.

5.      Nautilus has a duty to indemnify and defend Norfolk Southern with respect to the *Helbert* Lawsuit.

6.      Nautilus has breached the duty to defend and indemnify Norfolk Southern.

7.      Because of Nautilus's breach, Norfolk Southern has been left to defend itself against the *Helbert* lawsuit without the benefit of the insurance protection to which it is entitled.

8.      Norfolk Southern seeks damages from Nautilus for breach of its contractual duty to defend Norfolk Southern and a declaration of Nautilus's continuing duty to defend the ongoing *Helbert* Lawsuit as well as its duty to indemnify Norfolk Southern in the event of an adverse judgment, in or voluntary resolution of, the *Helbert* Lawsuit.

9.      National Salvage, in derogation of its contractual and common law duties, has failed to indemnify and reimburse the defense expenses Norfolk Southern and NSC have and will continue to incur by defending themselves against the *Helbert* Lawsuit.

10.     Because of National Salvage's breach, Norfolk Southern and NSC have been left to defend themselves against the *Helbert* Lawsuit without the benefit of the reimbursement and/or indemnification to which each is entitled.

11.     National Salvage has a duty to indemnify Norfolk Southern and NSC for, *inter*

*alia*, defense costs and any adverse judgment or settlement of the *Helbert* Lawsuit.

12.    National Salvage has breached the duty to indemnify Norfolk Southern and NSC for all defense costs Norfolk Southern and NSC have incurred to date.

13.    Norfolk Southern and NSC seek damages from National Salvage for breach of contract regarding its duty to reimburse Norfolk Southern's and NSC's existing defense costs and a declaration of National Salvage's continuing indemnity for their ongoing costs to defend the *Helbert* Lawsuit as well as its duty to indemnify Norfolk Southern and NSC in the event of an adverse judgment in, or voluntary resolution of, the *Helbert* Lawsuit.

## PARTIES

14.    Plaintiff Norfolk Southern is and, at all pertinent times, was a Virginia corporation with a principal place of business in Atlanta, Georgia.

15.    Plaintiff NSC is and, at all pertinent times, was a Virginia corporation with a principal place of business in Atlanta, Georgia.

16.    Defendant Nautilus is and, at all pertinent times, was an insurance company incorporated under the law of the State of Arizona with its principal place of business in Scottsdale, Arizona.

17.    Defendant National Salvage is and, at all pertinent times, was a business incorporated under the law of the State of Indiana with its principal place of business in Bloomington, Indiana.

## JURISDICTION AND VENUE

18.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this Action is between citizens of different states and the amount in controversy exceeds the $75,000 jurisdictional minimum.

19.     This Court has personal jurisdiction over Nautilus because the Nautilus Policy has a choice-of-forum clause stating that Nautilus consents to personal jurisdiction in New York and requires all suits involving the Policy to be brought in New York.

20.     This Court has personal jurisdiction over National Salvage because National Salvage secured the Nautilus Policy, which included Norfolk Southern as an additional insured. Nautilus contractually agreed that New York would be the forum for all suits involving the Policy.

21.     Venue is proper in this Court because the parties consented to this Court through the choice of forum clause in the Nautilus Policy.

22.     This Court has authority to grant a declaratory judgment pursuant to 28 U.S.C. § 2201 because Norfolk Southern, NSC, National Salvage, and Nautilus are engaged in an actual controversy susceptible to specific relief.

## FACTUAL BACKGROUND

A.     *The Salvage Contract*

23.     On February 4, 2019, Norfolk Southern entered into a contract (the "Salvage Contract") with National Salvage.

24.     Pursuant to the Salvage Contract, National Salvage agreed to purchase, dismantle, and remove salvage materials from Norfolk Southern's right-of-way along various locations owned by Norfolk Southern.

25.     Pursuant to Paragraph 4 of the Salvage Contract, National Salvage agreed to indemnify Norfolk Southern and NSC:

4. **Indemnification**

(a) Purchaser [National Salvage] shall indemnify and hold harmless the Indemnified Parties from and against any and all liability,

damages, claims, suits, judgments, costs and expenses (including litigation costs, investigation costs, reasonable attorney fees, and . . . fines, penalties and losses arising from or in connection with: (i)(A) any alleged . . . loss of life of or personal injury to any Purchaser Party arising from, incident to or occurring in connection with the performance by Purchaser of this Contract or the presence of any Purchaser Party on the property of Railway unless such loss of life, personal injury or property loss or damage was caused solely by the negligence or intentional misconduct of Railway; provided, however, that if, under the law applicable to enforcement of this Contract, an agreement to indemnify against the indemnified party's own negligence is invalid, then in that event Purchaser's obligation to indemnify the Indemnified Parties under this Section shall be reduced in proportion to the negligence of Railway, if any, that proximately contributed to such loss of life, personal injury or property loss or damage. [1]

26.    Under the Salvage Contract, "Indemnified Party" is defined as NSR (the Salvage Contract shortens Norfolk Southern Railway Corporation to "NSR") and NSR Affiliates.

27.    NSC is an affiliate of Norfolk Southern because Norfolk Southern is a wholly-owned subsidiary of NSC.

28.    Pursuant to Paragraph 6 of the Salvage Contract, National Salvage agreed to procure and maintain a commercial general liability insurance policy on behalf of Norfolk Southern:

6. **<u>Insurance</u>**

Purchaser shall, at its expense, obtain and maintain during the Term, in a form and with companies satisfactory to Railway, the following insurance coverage:

…

(c) Commercial General Liability Insurance with a combined single limit of not less than $2,000,000 per occurrence for injury to or death of persons and damage to or loss or destruction of property. Such policy shall be endorsed to provide products and completed operations coverage and contractual liability coverage for liability assumed under this Contract.

---

[1] The term "Railway" in the Salvage Contract means to "Norfolk Southern Railway Company."

The contractual liability coverage shall be of a form that does not deny
coverage for operations conducted within 50 feet of any Railway hazard.
In addition, said policy or policies shall be endorsed to name Railway as
an additional insured and shall include a severability of interests provision.

29.     The Salvage Contract uses "Railway" to refer to Norfolk Southern Railway

Company.

30.     As evidence of its compliance with the insurance requirements under Section 6 of

the Salvage Contract, National Salvage provided Norfolk Southern a Certificate of Liability

Insurance dated July 1, 2021 ("Certificate of Liability Insurance").

31.     The Certificate of Liability Insurance stated that National Salvage maintained

liability insurance through Nautilus Policy Number ECP202652813 ("Policy").

32.     The Certificate of Liability Insurance identifies Norfolk Southern as an additional

insured under the Policy.

**B.    *Norfolk Southern's Insurance Coverage Under Nautilus's Policy***

33.     Nautilus issued the Policy, a commercial general liability insurance policy

covering the period of July 1, 2021 to July 1, 2022, to National Salvage.

34.     The Nautilus Policy contains the following additional insured endorsement:

**SECTION III – WHO IS AN INSURED** is amended to include as an additional
**insured**:

**1.** Any person or organization for whom you are performing operations when you
and such person or organization have agreed in writing in a contract or agreement,
in effect during this **policy period**, that such person or organization be added as
an additional **insured** on this policy; and

**2.** Any other person or organization you are explicitly required to add as an
additional **insured** under the contract or agreement described in Paragraph **1.**
above.

…

Such person(s) or organization(s) is an additional **insured** only with respect to
liability for **bodily injury** or **property damage** under **SECTION I –**

**COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY** . . . directly caused by:

**a.** Your acts or omissions; or

**b.** The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional **insured** described in Paragraph **1.** or **2.** Above.

35.     The Policy provisions, subject to its terms, extends coverage to Norfolk Southern as an additional insured.

36.     Paragraph 6 of the Salvage Contract is the insurance provision.

37.     Paragraph 6 of the Salvage Contract requires National Salvage to add Norfolk Southern as an additional insured to National Salvage's commercial general liability insurance policy.

38.     The Nautilus Policy promises to "pay those sums that the insured becomes legally obligated to pay as damages for bodily injury" because of "bodily injury" suffered by a third-party that arises out of a covered occurrence during the policy period.

39.     The Nautilus Policy promises that Nautilus "will have the right and duty to defend the insured against any suit seeking those damages."

40.     The Nautilus's Policy's duty to defend obligates Nautilus to defend Norfolk Southern in the event of a suit seeking, *inter alia*, sums Norfolk Southern would be legally obligated to pay as damages for bodily injury arising out of a covered occurrence.

41.     The Nautilus Policy defines "bodily injury" as "[p]hysical injury, sickness or, disease, sustained by any person, including death, and solely with respect to this Paragraph 6.a. of this definition," and "[m]ental anguish or emotional distress sustained by any person."

42.     The Nautilus Policy defines "bodily injury" as "Physical injury, sickness or, disease, sustained by any person, including death."

7

43.     The Nautilus Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, that is unexpected and unintended from the standpoint of a reasonable person."

44.     At all times pertinent to this action, the Nautilus Policy was in full force and effect.

**C.    *Mr. Helbert's Accident***

45.     In December 2021, National Salvage was working pursuant to the Salvage Contract by assigning certain of its employees, including Mr. Helbert, to work on a section of track in Reed Township, Dauphin County, Pennsylvania, where Norfolk Southern was replacing more than 1,000 feet of continuous welded rail ("Job Site").

46.     At all times relevant to the Complaint, Mr. Helbert was employed and paid by National Salvage.

47.     On December 8, 2021, Mr. Helbert was at the Job Site.

48.     While at the Job Site on December 8, 2021, Mr. Helbert was conducting work pursuant to the Salvage Contract.

49.     While working pursuant to the Salvage Contract on December 8, 2021, Mr. Helbert, a National Salvage employee, qualified as a "Purchaser Party" as the term is defined in the Salvage Contract.

50.     While working pursuant to the Salvage Contract on December 8, 2021, Mr. Helbert, a National Salvage employee, qualified as a "Purchaser Party" as the term is defined in the Salvage Contract.

51.     Norfolk Southern had a work crew comprised of numerous Norfolk Southern track employees and three spiker machines operating at the Job Site.

52.     Spiker machines are large, on-track machines that drive railroad spikes into tie plates and cross ties.

53.     National Salvage employees, including Mr. Helbert, worked with the Norfolk Southern work crew.

54.     Mr. Helbert's job on behalf of National Salvage was to mark and help cut the rail that Norfolk Southern was replacing.

55.     Before Norfolk Southern allows National Salvage employees, including Mr. Helbert, to work on Norfolk Southern's property, National Salvage is required to train its workers through a Roadway Worker Protection course.

56.     After completion of the Roadway Worker Protection course, the employees are given a certification to demonstrate they have completed the course.

57.     At the time of the Accident, National Salvage and its employees were required to follow Norfolk Southern's safety rules and guidelines.

58.     Mr. Helbert had completed the Roadway Worker Protection training before December 8, 2021.

59.     Mr. Helbert had received the required contractor certification necessary to allow him to work on Norfolk Southern properties before December 8, 2021.

60.     The Policy was in effect on December 8, 2021.

61.     On December 8, 2021, three spiker machines were spiking rail at the Job Site at which National Salvage had contracted to support Norfolk Southern.

62.     As one of the spikers moved from south to north at a slow rate of speed, that spiker struck and killed Mr. Helbert (the "Accident").

63.    At the time of the Accident, Mr. Helbert was on the Norfolk Southern right-of-way and was standing between the rails (the space between the rails is referred to as the rail gauge).

64.    Mr. Helbert was trained not to stand in the rail gauge unless he had specific permission to do so.

65.    At the time of the Accident, Mr. Helbert did not have specific permission to be in the rail gauge.

66.    At the time of the Accident, Mr. Helbert did not inform anyone that he was going to be in the rail gauge.

67.    At the time of the Accident, had Mr. Helbert not been standing in the rail gauge, he would not have been struck by the spiker.

68.    Mr. Helbert was trained to be aware of his surroundings.

69.    At the time of the Accident, Mr. Helbert was not aware of his surroundings.

70.    At the time of the Accident, had Mr. Helbert been aware of his surroundings, he would not have been struck by the spiker.

71.    Mr. Helbert's position standing in the rail gauge at the time of the Accident was in violation of Norfolk Southern's safety rules and guidelines.

72.    Prior to conducting work at the Job Site each day, National Salvage was required to conduct a job safety briefing with its employees.

73.    On December 8, 2021, National Salvage did not conduct a job safety briefing.

74.    On December 8, 2021, Norfolk Southern's safety rules and guidelines required employees of contractors to wear Norfolk Southern-approved high-visibility safety vests when required to be on any railroad track or right-of-way or in the rail gauge.

75.     On December 8, 2021, National Salvage was a contractor of Norfolk Southern, and Mr. Helbert was an employee of National Salvage.

76.     On December 8, 2021, Mr. Helbert was standing in the right-of-way and in the rail gauge.

77.     As an employee of National Salvage working pursuant to the Salvage Contract, Mr. Helbert was required to follow other Norfolk Southern safety rules and guidelines.

78.     At the time of the Accident, Mr. Helbert was in violation of Norfolk Southern's safety rules and guidelines.

**D.     *The Helbert Lawsuit and Norfolk Southern's Notice to Its Indemnitors***

79.     On May 10, 2022, Norfolk Southern provided Nautilus with notice of an expected Helbert Lawsuit ("May 10, 2022, Notice").

80.     Norfolk Southern requested that Nautilus acknowledge its duties and obligations to Norfolk Southern under the Nautilus Policy.

81.     On May 23, 2022, Nautilus acknowledged receipt of Norfolk Southern's May 10, 2022, letter.

82.     In its May 23, 2022, response, Nautilus asserted that Norfolk Southern's notice of claim was "premature."

83.     The Policy authorizes Nautilus to "investigate any occurrence and settle any claim or suit that may result."

84.     At the time of Nautilus's May 23, 2022 response to Norfolk Southern, Nautilus did nothing to investigate the Helbert Estate's claim beyond asking one factual question about the Accident: Whether the spiker was operated by an employee of Norfolk Southern or by an employee of a Norfolk Southern contractor or vendor.

85.    Nautilus wrote in its May 23, 2022, correspondence that it was "presently unable to evaluate coverage."

86.    On September 15, 2022, Norfolk Southern responded to Nautilus's May 23, 2022 letter providing Nautilus with answers to all six of Nautilus's questions, including the one factual question concerning the claim.

87.    Nearly one year later, on May 1, 2023, Norfolk Southern again requested that Nautilus acknowledge its duties and obligations to Norfolk Southern under the Nautilus Policy after learning from counsel for the Helbert Estate that the filing of a lawsuit was imminent.

88.    On May 3, 2023, Nautilus responded with a letter that was substantively identical to the May 23, 2022, letter Nautilus had sent the year before.

89.    In its May 3, 2023, letter, Nautilus again declared that Norfolk Southern's request for a coverage determination was premature.

90.    In its May 3, 2023, letter, Nautilus again sent a list of questions that Nautilus claimed was necessary for their investigation of the claim.

91.    Those six questions in Nautilus's May 3, 2023, letter were substantively identical to the six questions presented in its May 23, 2022, letter that Norfolk Southern already had answered in writing.

92.    Although Nautilus could have investigated the Accident prior to May 2023, it chose not to do so.

93.    On May 19, 2023, Norfolk Southern responded to Nautilus's May 3, 2023, letter.

94.    In Norfolk Southern's May 19, 2023, letter, Norfolk Southern again requested that Nautilus acknowledge Norfolk Southern's status as an additional insured.

95.     On December 4, 2023, Kevin Helbert and Janice Stevenson, co-personal representatives of the Decedent's estate (together "Plaintiffs"), initiated the "Helbert Lawsuit" by filing a complaint (the "Helbert Complaint") seeking compensatory damages, pre-judgment interest, post-judgement interest, costs, and such other and further relief as the Court and jury deem appropriate.

96.     On December 4, 2023, Norfolk Southern provided Nautilus with notice of the now-filed Helbert Lawsuit by forwarding the Helbert Complaint.

97.     In its December 4, 2023, letter, Norfolk Southern requested that Nautilus provide a timely response acknowledging its insurance coverage obligations in connection with the Helbert Lawsuit.

98.     In its December 4, 2023, letter, Norfolk Southern advised Nautilus that it would continue to act as if it were a reasonable uninsured to protect and defend its interests as well as those of its insurer (Nautilus) and contractual indemnitor (National Salvage).

99.     On March 26, 2024, Neil Mody, counsel to Nautilus, sent a letter to Norfolk Southern announcing that Nautilus did not have obligations under the Nautilus Policy to defend and indemnify Norfolk Southern in connection with the Helbert Lawsuit.  Mr. Mody's March 26, 2024, letter stated that "Nautilus respectfully maintains that it has no duty to defend or obligation to indemnify NSRC or NSC in connection with the Complaint under the EPC Policy or Excess Policy."

100.    National Salvage believes that it owes Norfolk Southern indemnification relative to the Helbert matter.

101.    Initially, National Salvage paid $28,000.00 of Norfolk Southern's legal fees but has not made any further payments.

## CLAIMS FOR RELIEF AGAINST NAUTILUS (By Norfolk Southern Only)

### Count One:
### Declaratory Judgment Regarding Nautilus's Duty to Defend and Indemnify Norfolk Southern as an Additional Insured

102.    Norfolk Southern incorporates paragraphs 1-101 as if set forth fully herein.

103.    The Nautilus Policy defines an additional insured as "Any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement, in effect during this policy period, that such person or organization be added as an additional insured on this policy."

104.    Norfolk Southern satisfies the definition of "Additional Insured" because, pursuant to Paragraph 6 of the Salvage Contract, National Salvage agreed to add Norfolk Southern as an additional insured under the Nautilus Policy.

105.    The Nautilus Policy provides additional insured status for bodily injury claims for those injuries "directly caused by a. Your [National Salvage] acts or omissions; b. The acts or omissions of those acting on your behalf."

106.    The Accident was directly caused by Mr. Helbert, who, while employed by National Salvage and completing work duties on its behalf, stood in the rail gauge while rail equipment approached and then struck him.

107.    As a result of Mr. Helbert's presence in the rail gauge, and given his failure to step out of the rail gauge when the rail spiker approached and failure to adhere to other Norfolk Southern's safety rules and guidelines, Mr. Helbert was struck by the spiker and suffered bodily injury.

108.    Norfolk Southern's alleged liability with respect to claims asserted in the Helbert Complaint arises out of Mr. Helbert's failure to follow Norfolk Southern's safety rules and

14

guidelines while working for National Salvage to carry out its ongoing operations on the Job
Site.

109.    With respect to the Helbert Lawsuit, Norfolk Southern is an additional insured
under the Policy's Additional Insured Endorsement.

110.    The Nautilus Policy provides that "We will pay those sums that the insured
becomes legally obligated to pay as damages for bodily injury . . . . We will have the right and
duty to defend the insured against any suit seeking those damages."

111.    The Helbert Complaint seeks "damages" from Norfolk Southern due to "wrongful
death" and "bodily injury" arising out of an "occurrence" that took place during the "policy
period," as those terms are defined in, or otherwise within the meaning of, the Nautilus Policy.

112.    The Nautilus Policy defines "bodily injury" as "Physical injury, sickness or,
disease, sustained by any person, including death."

113.    The Helbert Complaint seeks damages due to bodily injury because, in asserting a
wrongful death claim, it asserts that Mr. Helbert suffered a bodily injury (death).

114.    The Nautilus Policy defines "occurrence" as "an accident, including continuous or
repeated exposure to substantially the same general harmful conditions, that is unexpected and
unintended from the standpoint of a reasonable person."

115.    The Accident was an occurrence because Mr. Helbert's death was unexpected and
unintended from the standpoint of a reasonable person.  There is no evidence or allegation that
Norfolk Southern expected and intended for a rail spiker to strike and kill Mr. Helbert.

116.    The "policy period" ran from July 1, 2021, to July 1, 2022.

117.    The Accident occurred on December 8, 2021.

118.    December 8, 2021, is within the July 1, 2021, to July 1, 2022, policy period.

119.    On May 10, 2022, Norfolk Southern provided Nautilus with notice of the claim that eventually became the Helbert Lawsuit.

120.    On May 23, 2022, Nautilus replied that Norfolk Southern's notice was premature.

121.    On May 1, 2023, Norfolk Southern provided additional notice to Nautilus of the claim that eventually became the Helbert Lawsuit.

122.    On May 3, 2023, Nautilus replied that Norfolk Southern's notice was premature.

123.    On December 4, 2023, the Helbert Estate filed the Helbert Lawsuit.

124.    That same day (December 4, 2023), Norfolk Southern provided Nautilus with a copy of the Complaint from the Helbert Lawsuit.

125.    Nautilus had timely notice under the Nautilus Policy of the claims against Norfolk Southern in the Helbert Lawsuit.

126.    Nautilus denied coverage on March 26, 2024.

127.    The Policy obligates Nautilus to provide Norfolk Southern a defense to the Helbert Lawsuit.

128.    Nautilus has not provided Norfolk Southern a defense to the Helbert Lawsuit.

129.    Nautilus has not reimbursed Norfolk Southern for the defense costs Norfolk Southern has incurred.

130.    Nautilus has indicated that it will not indemnify Norfolk Southern in the event Norfolk Southern receives an adverse judgment following trial of the Helbert matter.

131.    An actual controversy of a justiciable nature has arisen and exists between Norfolk Southern and Nautilus concerning the allegations set forth in this Count.

## Count Two
## Nautilus's Breach of its Contractual Obligation to Defend

132.    Norfolk Southern and NSC incorporate paragraphs 1-131 as if set forth fully herein.

133.    Norfolk Southern is an additional insured under the Nautilus Policy with respect to liability caused, in whole or in part, by National Salvage's ongoing operations under the Salvage Contract.

134.    The Helbert Complaint seeks "damages" from Norfolk Southern due to "wrongful death" and "bodily injury" arising out of an "occurrence" that took place during the "policy period," as those terms are defined in, or otherwise within the meaning of, the Nautilus Policy.

135.    The Nautilus Policy defines "bodily injury" as "Physical injury, sickness or, disease, sustained by any person, including death."

136.    The Helbert Complaint alleges bodily injury because it asserts a wrongful death claim and wrongful death is a bodily injury.

137.    The Nautilus Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, that is unexpected and unintended from the standpoint of a reasonable person."

138.    The Accident was an "occurrence" because Mr. Helbert's death was unexpected and unintended from the standpoint of a reasonable person.

139.    Norfolk Southern neither expected nor intended that Mr. Helbert would be struck and killed by a spiker.

140.    The Policy's "policy period" ran from July 1, 2021, to July 1, 2022.

141.    The Accident occurred on December 8, 2021, within the policy period.

142.    The Nautilus Policy provides that "We will pay those sums that the insured becomes legally obligated to pay as damages for bodily injury . . . We will have the right and duty to defend the insured against any suit seeking those damages."

143.    Because the Helbert Complaint seeks "damages" from Norfolk Southern on account of "bodily injury" arising out of an "occurrence" that took place during the "policy period," as those terms are defined in, or otherwise within the meaning of, the Nautilus Policy, the Helbert Complaint triggers Nautilus's obligation to defend Norfolk Southern or pay Norfolk Southern's reasonable defense costs.

144.    Nautilus has a duty to defend or pay defense costs of Norfolk Southern under the Nautilus Policy with respect to the claims asserted against it in the Helbert Lawsuit.

145.    On May 10, 2022, Norfolk Southern provided Nautilus with notice of the claim that eventually became the Helbert Lawsuit.

146.    On May 23, 2022, Nautilus replied that Norfolk Southern's notice was premature.

147.    On May 1, 2023, Norfolk Southern provided additional notice to Nautilus of the claim that eventually became the Helbert Lawsuit.

148.    On May 3, 2023, Nautilus replied that Norfolk Southern's notice was premature.

149.    On December 4, 2023, the Helbert Estate filed the Helbert Lawsuit.

150.    That same day (December 4, 2023), Norfolk Southern provided Nautilus with a copy of the Complaint from the Helbert Lawsuit.

151.    Nautilus had timely notice under the Nautilus Policy of the claims against Norfolk Southern in the Helbert Lawsuit.

152.    Nautilus denied coverage on March 26, 2024.

153.    Norfolk Southern has incurred reasonable costs to defend against the claims alleged in the Helbert Lawsuit and continues to incur additional defense costs as the Helbert Lawsuit continues.

154.    Nautilus's duty to defend or pay defense costs is mature, has not been excused, and has not been discharged.

155.    Nautilus has neither acknowledged nor performed its contractual duty to defend or pay the defense costs of Norfolk Southern has incurred to date as it defends itself against the Helbert Lawsuit.

156.    With respect to amounts Norfolk Southern has paid and will pay to defend the Helbert Lawsuit, Norfolk Southern has discharged, or is excused from discharging, any obligation to perform conditions precedent to coverage, and any covenants the breach of which would form a partial or total defense to Nautilus's performance.

157.    As a direct and proximate result of Nautilus's breach of its contractual obligation to defend or pay defense costs, Norfolk Southern has incurred damages in an amount to be determined at trial.

**CLAIMS FOR RELIEF AGAINST NATIONAL SALVAGE (By All Plaintiffs)**

**Count Three:**
**Declaratory Judgment Regarding National Salvage's Duty to Indemnify Norfolk Southern and NSC for Defense Costs and any Judgment or Settlement of the *Helbert* Lawsuit**

158.    Norfolk Southern and NSC incorporate paragraphs 1-157 as if set forth fully herein.

159.    The Salvage Contract was entered into on February 4, 2019.

160.    The Accident occurred on December 8, 2021, which is within the active period of the Salvage Contract.

161.    Pursuant to Paragraph 4 of the Salvage Contract, National Salvage agreed to indemnify Norfolk Southern and NSC for damages, claims, suits, judgments, costs, and expenses arising from or in connection with "loss of life" or "personal injury" to any National Salvage party arising from, incident to, or occurring in connection with performance under the Salvage Contract on Norfolk Southern's property.

162.    The Helbert Lawsuit is a claim for a personal injury (death) which arose from an accident that occurred in connection with National Salvage's performance under the Salvage Contract.

163.    Mr. Helbert was an employee of National Salvage.

164.    On the date of the Accident, Mr. Helbert was working in furtherance of the Salvage Contract.

165.    As an employee of National Salvage, Mr. Helbert was a "Purchaser Party" or "National Salvage party" under the Salvage Contract.

166.    Mr. Helbert's loss of life was caused, at least in part, by Mr. Helbert, who, while employed by National Salvage and completing work duties on its behalf, stood in the rail gauge without awareness of his surroundings (including the location and movement of the spikers) and in violation of Norfolk Southern's safety rules and guidelines while rail equipment approached and then struck him.

167.    As a result of Mr. Helbert's presence in the rail gauge, his failure to step out of the rail gauge when a spiker approached, and his failure to adhere to Norfolk Southern's safety rules and guidelines, Mr. Helbert was struck by the spiker and suffered bodily injury.

168.    Norfolk Southern and NSC provided National Salvage with timely notice of the claims in the Helbert Lawsuit and National Salvage has failed to fulfill its contractual obligations

to indemnify Norfolk Southern and NSC.

169.    National Salvage believes that it owes Norfolk Southern and NSC indemnification relative to the Helbert matter.

170.    Initially, National Salvage paid $28,000.00 of Norfolk Southern's legal fees, but has not made any further payments.

171.    Accordingly, an actual controversy of a justiciable nature has arisen and exists between Norfolk Southern, NSC and National Salvage concerning the allegations set forth in this Count.

**Count Four:**
**National Salvage's Breach of its Contractual Obligation to Indemnify**
**Norfolk Southern and NSC**

172.    Norfolk Southern and NSC incorporate paragraphs 1-171 as if set forth fully herein.

173.    The Accident that resulted in Mr. Helbert's death and gave rise to the Helbert Lawsuit arose from National Salvage's actions in performance of the Salvage Contract.

174.    The Helbert Lawsuit is a claim for personal injury (death).

175.    The Salvage Contract provides that National Salvage is obligated to indemnify Norfolk Southern for claims against Norfolk Southern for personal injury, including death, arising from incidents occurring in connection with performance under the Salvage Contract.

176.    National Salvage has an express contractual duty to indemnify Norfolk Southern and NSC under the Salvage Contract with respect to the claims asserted against Norfolk Southern and NSC in the Helbert Complaint.

177.    National Salvage's contractual duty extends to "any and all liability, damages, claims, suits, judgments, costs and expenses (including litigation costs, investigation costs, reasonable attorney fees, and . . . fines, penalties and losses.

178.    Norfolk Southern and NSC already have incurred indemnified expenses, including attorneys' fees, in its defense of the Helbert Lawsuit.

179.    Norfolk Southern and NSC continue to incur indemnified expenses, including attorneys' fees, in its defense of the Helbert Lawsuit.

180.    National Salvage has failed to perform its contractual duty to indemnify Norfolk Southern and NSC from and against expenses, including attorneys' fees, incurred in defense of the Helbert Lawsuit.[2]

181.    National Salvage's failure to perform its contractual duty to indemnify Norfolk Southern and NSC is a breach of the Salvage Contract.

182.    As a direct and proximate result of National Salvage's breach of its contractual obligation to indemnify, Norfolk Southern and NSC have incurred damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

183.    WHEREFORE, Norfolk Southern and NSC pray that this Court enter judgment as follows:

---

[2] While Norfolk Southern and NSC assert claims against National Salvage related to breach of the Salvage Contract, they expect that National Salvage will have coverage for any damages owed from Nautilus under the Nautilus Policy's insured contract provision. The Policy provides that an "insured contract" includes "[t]hat part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for bodily injury or property damage to a third person or organization." Nautilus Policy, at 45. The Salvage Contract is an insured contract because National Salvage agreed in advance to indemnify Norfolk Southern and NSC for subsequent claims alleging death or personal injury, including claims like that asserted in the *Helbert* Lawsuit. *See* Salvage Contract, ¶ 4.

184.    On its First Cause of Action, enter a declaratory judgment in favor of Norfolk Southern declaring that, under the Nautilus Policy, Norfolk Southern is an additional insured entitled to a defense and indemnification for liabilities arising out of the Helbert Action.

185.    On its Second Cause of Action, find a breach of the duty to defend or reimburse defense costs under the Nautilus Policy with respect to the Helbert Lawsuit and award damages in an amount to be determined at trial.

186.    On its Third Cause of Action, enter a declaratory judgment in favor of Norfolk Southern and NSC declaring that, under the Salvage Contract, Norfolk Southern and NSC are entitled to indemnification from National Salvage for liabilities arising out of the Helbert Action.

187.    On its Fourth Cause of Action, find that National Salvage breached its duty owed to Norfolk Southern and NSC to indemnify under the Salvage Contract with respect to the Helbert Lawsuit and award damages to Norfolk Southern and NSC in an amount to be determined at trial.

188.    On all Causes of Action, award pre-judgment interest, post-verdict and post-judgment interest, the fees and costs of bringing this action until and including the rendition of judgment, and all other just and equitable relief.

## REQUEST FOR JURY TRIAL

Norfolk Southern and NSC request trial by jury on all issues, claims, and defenses to the fullest extent permitted by law.

Dated: June 17, 2024

Donald R. McMinn *(pro hac vice forthcoming)*
Louis M. Russo
Erin Nebbia *(pro hac vice forthcoming)*
Hollingsworth<sub>LLP</sub>
1350 I Street, NW
Washington, DC 20005
P: (202) 898-5800
F: (202) 682-1639
dmcminn@hollingsworthllp.com
lrusso@hollingsworthllp.com
enebbia@hollingsworthllp.com

*Attorneys for Plaintiffs Norfolk Southern Railway*
*Company and Norfolk Southern Corporation*