UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

NORFOLK SOUTHERN RAILWAY COMPANY
                    Plaintiff,                    24-cv-4622 (JGK)

        - against -                               MEMORANDUM OPINION
                                                  AND ORDER
NAUTILUS INSURANCE COMPANY AND
NATIONAL SALVAGE & SERVICE
CORPORATION,
                    Defendants.
─────────────────────────────────

JOHN G. KOELTL, District Judge:

    This case concerns the responsibilities for defense and in-

demnification in a personal injury action, arising out of a

tragic accident in which an employee of a salvage company was

killed by a striker car operated by a railroad employee while

the deceased was performing salvage operations on the railroad's

property. The plaintiff, Norfolk Southern Railway Company ("Nor-

folk"),[1] brings this action against defendants Nautilus Insurance

Company ("Nautilus") and National Salvage & Service Corporation

("National Salvage") under this Court's diversity jurisdiction.

See Compl. ¶ 18, ECF No. 1. Norfolk seeks declaratory relief, a

defense, indemnification, reimbursement, and damages arising

from National Salvage's alleged breach of an indemnification

─────────────

[1] On August 28, 2025, Norfolk Southern Corporation filed a notice voluntarily
dismissing all of its claims against National Salvage (Counts III and IV).
See ECF No. 80. Accordingly, only Norfolk Southern Railway Company now main-
tains claims against Nautilus (Counts I and II) and National Salvage (Counts
III and IV). See ECF No. 82. Because Norfolk Southern Corporation maintains
no claim in this case, Norfolk Southern Corporation is no longer a plaintiff.
See id.

provision in the contract between Norfolk and National Salvage and Nautilus's alleged breach of an insurance policy that Norfolk contends covers Norfolk's potential liability in a state-court tort action brought by the Estate of Kolton Helbert (the "Helbert Action"). See id. at 22-23; Estate of Kolton Helbert v. Norfolk S. Ry. Co. & Nordco, Inc., No. 231200231 (Pa. Ct. Com. Pl. Phila. Cnty.).

Norfolk seeks a declaratory judgment that Nautilus has a duty to defend and indemnify Norfolk in the Helbert Action (Count I), and it asserts a claim for breach of contract based on Nautilus's alleged failure to provide a defense (Count II). See Compl. ¶¶ 102–57. Norfolk also seeks a declaratory judgment that National Salvage has a duty to indemnify Norfolk in the Helbert Action (Count III), and it asserts a claim for breach of contract based on National Salvage's alleged failure to indemnify Norfolk (Count IV). See id. ¶¶ 158–82.

Norfolk now moves for summary judgment on all claims. See ECF No. 39. Nautilus cross-moves for summary judgment dismissing the claims (Counts I and II) against it. See ECF No. 47. National Salvage also cross-moves for summary judgment dismissing the claims (Counts III and IV) against it. See ECF No. 43.

## I. Background

The following facts are based on the parties' Rule 56.1 statements, counterstatements, and supporting papers, and are undisputed unless otherwise noted.[2]

Norfolk is a railroad company that owns and operates freight railways across the eastern United States. Nautilus Rule 56.1 Statement ¶ 2, ECF No. 50. Norfolk is incorporated in Virginia and has its principal place of business in Atlanta, Georgia. National Salvage Rule 56.1 Statement ¶ 1, ECF No. 43. National Salvage is a demolition contractor that specializes in the dismantling and salvage of railroad track material. Id. ¶ 2. National Salvage is incorporated in Indiana and has its principal place of business in Bloomington, Indiana. National Salvage Answer ¶ 17, ECF No. 16. Nautilus is an insurance company incorporated in Arizona with its principal place of business in Scottsdale, Arizona. Nautilus Answer ¶ 16, ECF No. 13.

### A. The Salvage Contract

On February 4, 2019, Norfolk entered into a written agreement (the "Salvage Contract") with National Salvage, pursuant to which National Salvage agreed to purchase salvage materials from Norfolk and remove salvage materials from Norfolk's property. Norfolk Rule 56.1 Statement ¶ 1, ECF No. 42. The Salvage

---

[2]  Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

Contract contains an indemnification provision that provides, in relevant part:

> Purchaser [National Salvage] shall indemnify and hold harmless the Indemnified Parties from and against any and all liability, damages, claims, suits, judgments, costs and expenses (including litigation costs . . . [and] reasonable attorney fees), . . . arising from or in connection with: . . . any . . . loss of life of or personal injury to any Purchaser Party arising from, incident to or occurring in connection with the performance by Purchaser of this Contract or the presence of any Purchaser Party on the property of Railway [Norfolk], unless such loss of life . . . was caused solely by the negligence or intentional misconduct of Railway; provided, however, that if, under the law applicable to enforcement of this Contract, an agreement to indemnify against the indemnified party's own negligence is invalid, then in that event Purchaser's obligation to indemnify the Indemnified Parties under this Section shall be reduced in proportion to the negligence of Railway, if any, that proximately contributed to such loss of life, personal injury or property loss or damage.

Russo Decl. Ex. A (the "Salvage Contract") 3, ECF No. 41-1. The parties dispute whether the "Indemnified Parties" refers only to Norfolk and its affiliates or also includes other entities, such as Conrail, Inc. Norfolk Rule 56.1 Statement ¶ 6; National Salvage Rule 56.1 Counterstatement ¶ 6. The parties do not dispute, however, that Norfolk is an "Indemnified Part[y]" under the Salvage Contract. National Salvage Rule 56.1 Statement ¶ 16.

The Salvage Contract also required National Salvage to procure:

> Commercial General Liability Insurance with a combined single limit of not less than $2,000,000 per occurrence for injury to or death of persons . . .

The Salvage Contract 4-5.

The Salvage Contract required National Salvage employees to wear specified protective equipment, including hard hats, steel-toed boots, and safety glasses. Id. at 14. The Salvage Contract also required that, while working in the "Work Area," National Salvage employees comply with the flagging requirements established by Norfolk's employees. Id. In addition, National Salvage was required to provide adequate erosion control while performing the work. Id.

The Salvage Contract contains a choice-of-law provision providing that it is to be construed in accordance with Virginia law. Id. at 7.

### B. The Nautilus Policy

Pursuant to the Salvage Contract, National Salvage procured an insurance policy from Nautilus (the "Nautilus Policy") providing coverage for an "additional insured." Russo Decl. Ex. V (the "Nautilus Policy") at NIC000074, ECF No. 41-22. The policy provides commercial general liability coverage of $5 million per occurrence. Id. at NIC000019. The certificate of liability insurance lists Norfolk as an additional insured. Russo Decl. Ex. W ("Certificate of Liability Insurance"), ECF No. 41-23.

The Nautilus Policy provides defense and coverage for an additional insured "only with respect to liability for bodily injury . . . directly caused by" the acts or omissions of National Salvage or its employees. The Nautilus Policy at NIC000074. It also provides that "the insurance afforded to such additional insured . . . will not be broader than that which [National Salvage is] required by the contract or agreement to provide for such additional insured." Id.

The Nautilus Policy contains a New York choice-of-law provision, providing that New York law governs all matters or disputes arising under the Policy, including "the validity, interpretation, performance, and enforcement of this policy." Id. at NIC000046.

### C. Underlying Incident

On December 8, 2021, Kolton Helbert ("Helbert"), an employee of National Salvage, was present at the worksite in Reed, Pennsylvania, pursuant to the Salvage Contract. Nautilus Rule 56.1 Statement ¶¶ 10, 13; National Salvage Rule 56.1 Statement ¶ 3. Helbert was tasked with marking and cutting old rail for salvage while another worker operated a truck to pick up the scrap rail. Nautilus Rule 56.1 Statement ¶ 13. Helbert was standing in the gauge of the track behind an on-track maintenance machine known as "Spiker 2," manufactured by Nordco, Inc. ("Nordco"). National Salvage Rule 56.1 Statement ¶ 4; Nautilus

Rule 56.1 Statement ¶ 16. A Norfolk employee operating Spiker 2 reversed the machine and struck Helbert, dragging Helbert several feet and killing him within minutes. National Salvage Rule 56.1 Statement ¶ 5; Nautilus Rule 56.1 Statement ¶ 31.

Norfolk's Operating Guideline for Contractors (the "Operating Guideline") requires a minimum standoff distance of 25 feet between workers and rail-mounted machines such as spikers. Nautilus Rule 56.1 Statement ¶ 29. The parties dispute Helbert's distance from Spiker 2. National Salvage contends that Helbert was approximately thirty feet behind the machine, while Norfolk contends that Helbert was within twenty-five feet. National Salvage Rule 56.1 Statement ¶ 4; Norfolk Resp. to National Salvage Rule 56.1 Statement ¶ 4, ECF No. 63. The post-incident investigation report prepared by the National Transportation Safety Board ("NTSB") indicated that Helbert was approximately twenty-nine feet from Spiker 2. Sambursky Decl. Ex. F ("NTSB Report") at 10-11, ECF No. 48-6.

Additionally, the Operating Guideline requires contractors to notify the designated Norfolk employee of their whereabouts while performing work on Norfolk's property. Nautilus Rule 56.1 Statement ¶ 12. The parties dispute whether Helbert had permission to be in the area at the time of the accident. Id. ¶ 14; Norfolk Resp. to Nautilus Rule 56.1 Statement ¶ 14.

7

Norfolk relies on the deposition testimony of Helbert's supervisor, James Robinson ("Robinson"), who testified that Helbert was required to, and often did, submit a job briefing to his supervisor or at least communicate by radio with the spiker operators before working within the rail. Sambursky Decl. Ex. 27 ("Robinson Dep.") 77:1–78:12, ECF No. 65-27. Robinson also testified, however, that he did not expect Helbert to be in the gauge on December 8, 2021. Id. 75:25–76:4.

Jordan Kisiel ("Kisiel"), a rail foreman, similarly testified that "any time [one] get[s] between the machines, it is normal, no matter the distance, to let the machine in front and behind you know you're getting in the foul." Sambursky Decl. Ex. 24 ("Kisiel Dep.") 45:6–9, ECF No. 65-24. Norfolk also points to Kisiel's statement that he did not receive any notification that Helbert had stepped between the machines that day and that Helbert's location was "out of the ordinary." Russo Decl. Ex. 5 ("Kisiel NTSB Interview Tr.") at 29:7–25, ECF No. 59-5.

Michael Szostek ("Szostek"), another track laborer, likewise testified that Helbert's day-to-day assignment was the same and that working in the gauge was "something that [Helbert] never did." Sambursky Decl. Ex. 28 ("Szostek Dep.") 32:9–23, ECF No. 65-28.

8

In addition, Norfolk cites statements from two other witnesses indicating that they did not receive any radio notification from Helbert that he would be in the gauge of the track. Russo Decl. Ex. 6 ("Noecker NTSB Interview Tr.") at 39:1–6, ECF No. 59-6; Russo Decl. Ex. 7 ("Rombach NTSB Interview Tr.") at 26:16–22, ECF No. 59-7.

Federal Railroad Administration ("FRA") regulations require that spikers be equipped with warning devices to alert personnel working near the machines of a change in direction. Nautilus Rule 56.1 Statement ¶ 18. Norfolk's spikers were equipped with an automatic change-of-direction alarm and a horn system. Id. ¶ 19. However, the change-of-direction alarm was not functioning properly on the day of the accident. Id. The parties dispute whether the horn system was also malfunctioning on the day of the accident. Id.; Norfolk Resp. to Nautilus Rule 56.1 Statement ¶ 19.

After Helbert's death, Helbert's estate commenced the Helbert Action in the Court of Common Pleas, Philadelphia County, Pennsylvania. Nautilus Rule 56.1 Statement ¶ 58. The estate asserted common-law negligence claims against Norfolk as well as claims under the Federal Employers' Liability Act ("FELA") and Pennsylvania's Wrongful Death Act and Survival Act. Id. ¶ 59. The complaint in the Helbert Action did not assert any claims against Helbert's employer, National Salvage. Id. ¶¶ 61-62.

9

Norfolk also did not sue National Salvage in the Helbert Action. Norfolk timely provided Nautilus with written notice of the facts relevant to the accident and the underlying lawsuit. Russo Decl. Exs. X, Y, Z, AA, ECF No. 41. Nautilus ultimately did not provide Norfolk with a defense in the Helbert Action. Nautilus Answer ¶ 128.

### D. NTSB Investigation

In early December 2021, the NTSB was notified of the accident and investigated the scene. Nautilus Rule 56.1 Statement ¶¶ 32–35. In its report, the NTSB found that Helbert was more than twenty-nine feet from Spiker 2 and that Norfolk's twenty-five-foot standoff-distance rule was inadequate to ensure that the operator could see roadway workers. The NTSB Report at vi, 10–11.

The NTSB reported that "only one of the four trumpets on the horn was working, and the speaker for the rear-change-of-direction alarm was unplugged." Id. at vi. The NTSB further concluded that it was "likely" that the rear change-of-direction alarm speaker was unplugged because the spiker was shipped from the manufacturer, Nordco, Inc., with incorrect connections. Id.

The NTSB ultimately identified three probable causes of the accident: (1) Norfolk's failure to inspect the audibility of the spiker's alert, (2) Nordco's failure to assure that the change-of-direction alarm was functioning when the spiker left the

10

factory, and (3) Norfolk's selection of an insufficient standoff distance. Id. at vi–vii.

Norfolk contends that the NTSB Report is inadmissible hearsay and therefore should not be considered on these motions. See, e.g., Norfolk Resp. to Nautilus Rule 56.1 Statement ¶¶ 38–39.

## II. Legal Standards

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. However, "disputed legal questions . . . present nothing for trial and are appropriately resolved on a motion for summary judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the movant meets that burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis omitted). At the summary judgment stage, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. See id.

In light of the choice-of-law provision in the Salvage Contract, the parties agree that Virginia law governs the enforceability of, and any limitations on, the Salvage Contract's indemnification provision. See Norfolk Mot. for Summ. J. ("Norfolk Mot.") 17-19, ECF No. 40; National Salvage Mot. for Summ. J. ("National Salvage Mot.") 13-22, ECF No. 45. Similarly, because the Nautilus Policy contains a New York choice-of-law provision, the parties agree that New York law governs issues concerning the duty to defend and the duty to indemnify under the Nautilus Policy. See Norfolk Mot. 22-25; Nautilus Mot. for Summ. J. ("Nautilus Mot.") 10-22. The Court therefore "follow[s] their lead." Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997).

### III. Norfolk Motion

Norfolk argues that its motion for summary judgment against National Salvage should be granted because: (1) the Salvage Contract's indemnification provision is enforceable under Virginia law, and, even if an agreement to indemnify Norfolk for its own negligence would be invalid, the provision is saved by the contract's savings clause, which limits indemnity in proportion to Norfolk's negligence; and (2) the record does not support a finding that Norfolk was solely negligent and, therefore, the Salvage Contract requires National Salvage to indemnify Norfolk for Helbert's personal injuries. See Norfolk Mot. for Summ. J. ("Norfolk Mot.") 11-22, ECF No. 40. Norfolk argues that its motion against Nautilus should be granted because Norfolk qualifies as an "additional insured" under the Nautilus Policy. See id. at 22-25.

### A.

Norfolk argues that National Salvage has an obligation to indemnify it in the Helbert Action and that National Salvage breached that obligation under the Salvage Contract. National Salvage argues initially that any obligations under the Salvage Contract are barred by Virginia Code § 11-4.1. National Salvage Opp'n to Norfolk Mot. for Summ. J. ("National Salvage Opp'n."), 7-10, ECF No. 62. Norfolk argues that the indemnification provisions in the Salvage Contract are not barred by the Virginia

13

statute because the work by National Salvage is not "construc-tion," the rail line is not a "structure," and the Salvage Contract does not implicate the construction phase of a project. Norfolk Mot. 17–19.

Section 11-4.1 provides that:

> Any provision contained in any contract relating to the construction, alteration, repair or maintenance of a building, structure or appurtenance thereto, including moving, demolition and excavation connected therewith, or any provision contained in any contract relating to the construction of projects other than buildings by which the contractor performing such work purports to indemnify or hold harmless another party to the contract against liability for damage arising out of bodily in-jury to persons or damage to property suffered in the course of performance of the contract, caused by or re-sulting solely from the negligence of such other party or his agents or employees, is against public policy and is void and unenforceable.

In Uniwest Const., Inc. v. Amtech Elevator Servs., Inc., the Supreme Court of Virginia instructed courts "to look to the contract containing the provision, not the circumstances from which the claim for indemnification arose, to determine whether an indemnification provision violates § 11-4.1." 699 S.E.2d 223, 230 (Va. 2010), opinion withdrawn in part on reh'g, 714 S.E.2d 560 (Va. 2011).

Following that instruction, the Court of Appeals for the Fourth Circuit held that a contract for the sale of roofing ma-terials that would ultimately be used "in the business of

14

installing and repairing roofing systems," is not a construction contract. Carpenter Insulation & Coatings v. Statewide Sheet Metal & Roofing, 937 F.2d 602 at *2-3 (4th Cir. 1991) (Table). Similarly, the district court in the Western District of Virginia has also rejected the argument that a rental agreement for a forklift to be used in a specific construction project qualified as a construction contract. RSC Equip. Rental, Inc. v. Cincinnati Ins., 54 F. Supp. 3d 480, 487 (W.D. Va. 2014). The principle illustrated by these cases is that an agreement to purchase or rent instrumentalities or materials that will be used for a construction project does not, without more, fall within the meaning of a "contract relating to the construction."

In this case, National Salvage's work under the Salvage Contract consists of purchasing salvage materials from Norfolk and removing them from the worksite. See the Salvage Contract 1. The Salvage Contract refers to National Salvage as "the Purchaser" and transfers the title of the salvage materials to National Salvage. Id. at 1-2. It sets a purchase price for the salvage materials — namely, the AMM No. 1 Heavy Melt-Chicago price on the 10th working day of the month minus $15 — but does not set a price for services such as construction work or the removal of salvage materials. Id. at 1.

Although National Salvage's obligations include removing the salvage materials from the worksite and following

15

miscellaneous safety instructions, these obligations, viewed in the context of the Salvage Contract as a whole, do not alter the Salvage Contract's essential character as an agreement for the purchase of salvage material; in other words, the sale-of-goods aspects predominate. Because the Salvage Contract is, at bottom, an agreement for the purchase of salvage materials, the holdings of Carpenter and RSC reasonably extend to this case. Accordingly, the Salvage Contract is not a "contract relating to construction" under § 11-4.1 and therefore is not void.[3]

**B.**

Norfolk also argues, contrary to National Salvage's contention, that National Salvage's obligation to indemnify Norfolk under the Salvage Contract is not barred by the provision of the Salvage Contract that bars indemnification if the loss of life "was caused solely by the negligence or intentional misconduct" of Norfolk. Norfolk Mot. 13-17. Norfolk argues that other parties, such as National Salvage (through Helbert's contributory negligence) and Nordco, also contributed to the accident. Id.

---

[3] The Salvage Contract also contains a savings clause in its indemnification provision, providing that "if, under the law applicable to enforcement of this Contract, an agreement to indemnify against the indemnified party's own negligence is invalid, then in that event Purchaser's obligation to indemnify the Indemnified Parties under this Section shall be reduced in proportion to the negligence of Railway." The Salvage Contract 3. It is unnecessary to reach Norfolk's argument that the savings clause applies because § 11-4.1 does not invalidate the Salvage Contract. In any event, even if the Salvage Contract's indemnification provision were held to violate Code § 11-4.1, National Salvage could still be obligated to indemnify Norfolk in proportion to Norfolk's negligence. See ZP No. 332, LLC v. Huffman Contractors, Inc., No. 2:24-cv-611, 2025 WL 1688918, at *2 (E.D. Va. June 16, 2025).

16

At this stage, an adjudication of indemnification premised on ultimate liability would be premature because the duty to indemnify is not yet ripe.

Virginia Code § 8.01-249(5) provides that, "[i]n actions for contribution or indemnification," the cause of action accrues only when "the contributee or the indemnitee has paid or discharged the obligation." Consistent with that rule, federal courts applying Virginia law have held that, absent a determination of ultimate liability in the underlying action, adjudication of indemnification risks the issuance of an advisory opinion on a claim that has not yet accrued. See, e.g., Golladay v. Nationwide Prop. & Cas. Ins., No. 5:22-cv-30, 2023 WL 1448058, at *3 (W.D. Va. Feb. 1, 2023); Green v. Hudson Ins., No. 5:20-cv-52, 2021 WL 279609, at *3 (W.D. Va. Jan. 27, 2021). That principle applies not only in insurance cases, but also in contract cases where the party seeking indemnification has not yet "establish[ed] that [it has] suffered a loss sufficient to trigger [the other party's] indemnity obligations." Summit Invs. II, L.P. v. Sam's E., Inc., No. 3:23-cv-479, 2024 WL 1223541, at *12 (E.D. Va. Mar. 21, 2024).

In this case, the underlying liability issues in the Helbert Action remain unresolved in state court; Norfolk, as the indemnitee, has not paid or discharged the obligation. Because the indemnification claim has not yet accrued, it is not ripe

17

for adjudication, and summary judgment on that claim is therefore inappropriate at this time.

Accordingly, Norfolk's motion for summary judgment on Counts III and IV, seeking a declaration that National Salvage has a duty to indemnify Norfolk under the Salvage Contract and has breached that duty, is **denied without prejudice**.

### C.

To the extent Norfolk argues that Nautilus owes Norfolk a duty to indemnify under the Nautilus Policy because National Salvage directly caused Helbert's injury through Helbert's own negligence, that issue is also not ripe for adjudication.

Under New York law, the duty to indemnify "is determined by the actual basis for the insured's liability to a third person." Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford, 477 N.E.2d 441, 444 (N.Y. 1985). Following that principle, the New York Court of Appeals has declined to address the duty to indemnify before any ultimate determination of the insured's liability. Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co., 690 N.E.2d 866, 870 (N.Y. 1997).

Courts in this Circuit applying New York law have also consistently held that the duty to indemnify is not ripe for adjudication when the underlying liability determination is still pending. See Penn-Star Ins. v. Loring Place Realty LLC, No. 22-cv-1154, 2024 WL 1255423, at *7 (S.D.N.Y. Mar. 25, 2024);

18

Mt. Vernon Fire Ins. v. Munoz Trucking Corp., 213 F. Supp. 3d 594, 604 (S.D.N.Y. 2016); Lafarge Canada Inc. v. Am. Home Assurance Co., No. 15-cv-8957, 2018 WL 1634135, at *5-6 (S.D.N.Y. Mar. 31, 2018); Admiral Ins. v. Niagara Transformer Corp., 57 F.4th 85, 94 (2d Cir. 2023).

As explained above, the underlying liability issues in the Helbert Action remain unresolved in state court. Because the question whether Helbert's injury was "directly caused by" acts of National Salvage depends on factual determinations still to be made, indemnification is not ripe for summary judgment at this time.

Therefore, to the extent that Norfolk moves for summary judgment on Count I seeking a declaration that Nautilus owes Norfolk a duty to indemnify under the Nautilus Policy, that motion is **denied without prejudice**.

### D.

Norfolk also argues in Counts I and II that Nautilus had a duty to defend Norfolk in the Helbert Action based on Norfolk's status as an additional insured under the Nautilus Policy, and that Nautilus breached that duty by failing to provide a defense.

Under New York law, an insurer's duty to defend is "exceedingly broad" and distinct from the duty to indemnify. Auto. Ins. Co. of Hartford v. Cook, 850 N.E.2d 1152, 1155 (N.Y. 2006). To

19

determine whether the duty to defend exists, courts first look to "the allegations within the four corners of the underlying complaint." Frontier Insulation, 690 N.E.2d at 868. An "insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy." Fieldston Prop. Owners Ass'n v. Hermitage Ins., 945 N.E.2d 1013, 1018 (N.Y. 2011).

However, the New York Court of Appeals has also explained:

> [T]o say that the duty to defend is at least broad enough to apply to actions in which the complaint alleges a covered occurrence is a far cry from saying that the complaint allegations are the sole criteria for measuring the scope of that duty. Indeed, in these circumstances, where the insurer is attempting to shield itself from the responsibility to defend despite its actual knowledge that the lawsuit involves a covered event, wooden application of the "four corners of the complaint" rule would render the duty to defend narrower than the duty to indemnify — clearly an unacceptable result. For that reason, courts and commentators have indicated that the insurer must provide a defense if it has knowledge of facts which potentially bring the claim within the policy's indemnity coverage . . . .

Fitzpatrick v. Am. Honda Motor Co., 575 N.E.2d 90, 92 (N.Y. 1991).

"Any ambiguity as to the insurer's duty to defend is resolved in favor of the insured." Int'l Bus. Mach. Corp. v. Liberty Mut. Ins., 363 F.3d 137, 144 (2d Cir. 2004) (citing Charles F. Evans Co. v. Zurich Ins., 731 N.E.2d 1109, 1110 (N.Y.

2000)). "If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action." Frontier Insulation, 690 N.E.2d at 869.

The Nautilus Policy provides additional-insured coverage "only with respect to liability for bodily injury . . . directly caused by" the acts or omissions of National Salvage or its employees. The Nautilus Policy at NIC000074. Norfolk argues that it triggered Nautilus's defense obligation because Norfolk sent Nautilus letters describing the accident and setting out Norfolk's theory that Helbert, a National Salvage employee, was at least partially responsible for his own accident. Norfolk Mot. 23-24.

In this case, Norfolk has presented sufficient evidence to show that the underlying action arguably falls within coverage because Helbert, as National Salvage's employee, may have directly caused his own injury. For example, Norfolk points to testimony from multiple witnesses indicating that Helbert was standing between the tracks and performing "out-of-ordinary" work without notifying others. Although there is evidence pointing the other way, including evidence of malfunctioning parts on Spiker 2 and deficiencies in Norfolk's operating guidelines, any ambiguity must be construed against the insurer in light of the "exceedingly broad" duty to defend. See Int'l Bus. Mach., 363 F.3d at 144. Accordingly, because Norfolk timely notified

21

Nautilus of evidence that arguably supported coverage, Nautilus owed Norfolk a duty to defend in the underlying action and breached that duty by failing to provide a defense.

Accordingly, Norfolk's motion for summary judgment on Counts I and II, insofar as those counts seek a declaratory judgment that Nautilus has a duty to defend Norfolk in the Helbert Action and breached that duty, is **granted.**

### IV. Nautilus Motion

### A.

Nautilus argues that it owes no duty to defend Norfolk because the complaint in the Helbert Action asserts claims only against Norfolk and pleads no liability against National Salvage, and thus alleges no "liability for bodily injury . . . directly caused by" the acts or omissions of National Salvage or its employees within the meaning of the Nautilus Policy. Nautilus Mot. for Summ. J. ("Nautilus Mot.") 13–17. Nautilus further contends that extrinsic facts do not support Norfolk's theory that Helbert's injury was directly caused by acts or omissions of National Salvage. Id. at 17–20.

That argument understates the record. In this case, Norfolk has identified extrinsic evidence that could arguably support a finding that the Helbert Action falls within the additional-insured coverage. Most notably, Norfolk points to multiple witnesses who described Helbert's conduct as "out of the

22

ordinary," including his decision to work within the rail gauge between two spikers without notifying others. Norfolk also provided Nautilus with written notices describing the accident and Norfolk's theory that Helbert's conduct directly caused his own injury. See Russo Decl. Exs. X, Y, Z, AA, ECF No. 41. Taken together, that evidence could arguably support a finding that Nautilus had knowledge of facts potentially bringing the Helbert Action within the Policy's additional-insured coverage for bodily injury "directly caused by" the acts or omissions of National Salvage or its employees. Nautilus Policy at NIC000074. Accordingly, Nautilus is not entitled to summary judgment dismissing Counts I and II to the extent those claims are premised on a duty to defend; Nautilus's motion for summary judgment on Counts I and II as to the duty-to-defend issues is **denied with prejudice**.

### B.

Nautilus also argues that it has no duty to indemnify Norfolk because the complaint in the underlying action does not allege that National Salvage directly caused Helbert's bodily injuries. That argument confuses the standard governing indemnity. Under New York law, unlike the duty to defend, the duty to indemnify "is determined by the actual basis for the insured's liability to a third person." Servidone Constr., 477 N.E.2d at 444 (N.Y. 1985). Because the underlying action remains pending

23

and no trier of fact has determined the basis of liability, any determination of Nautilus's duty to indemnify would be premature.

Nautilus also argues that, even if it owes Norfolk coverage and its policy actually provides coverage up to $5 million per occurrence, Nautilus's coverage for Norfolk, as an additional insured, cannot exceed $2 million per occurrence. Nautilus Mot. 21-22. Nautilus points to (1) the Salvage Contract's requirement that National Salvage obtain commercial general liability coverage with "a combined single limit of not less than $2,000,000 per occurrence for injury to or death of persons," and (2) the Nautilus Policy's limitation that the insurance afforded to an additional insured "will not be broader than that which [National Salvage is] required by the contract or agreement to provide for such additional insured." Id. On Nautilus's reading, the amount "required by the contract" is $2 million per occurrence, because procuring $2 million per-occurrence coverage would satisfy National Salvage's contractual obligation. Id.

Norfolk responds that the phrase "not less than $2,000,000 per occurrence" sets only a floor, not a ceiling; therefore, Nautilus has a duty to indemnify Norfolk for up to $5 million. Norfolk Opp'n to Nautilus Mot. for Summ. J. 14-17, ECF No. 58. But that response conflates (a) what the Salvage Contract permits National Salvage to procure with (b) what the Salvage

24

Contract actually requires National Salvage to procure. "Require" means "to demand as necessary or essential."[4] In this context, the Salvage Contract demands coverage of at least $2 million per occurrence; it does not demand coverage in excess of that amount. Put differently, National Salvage could choose to buy higher limits, and doing so would still satisfy the "not less than" requirement, but the higher limits are not "required by the contract." The Nautilus Policy provides that the insurance provided will "not be broader" than that which is "required by the contract . . . to provide for such additional insured." The Nautilus Policy therefore provides only $2 million in coverage, the amount that National Salvage is required to provide to Norfolk under the Salvage Contract.

Accordingly, any indemnification obligation under the Nautilus Policy would not exceed $2 million per occurrence. However, because the underlying liability issues remain pending, summary judgment on the duty to indemnify is premature. In sum, Nautilus's motion for summary judgment dismissing Count I is **denied without prejudice** to the extent those claims seek a declaration that Nautilus has a duty to indemnify.

---

4  Require, MERRIAM-WEBSTER.COM Dictionary, https://www.merriam-webster.com/dictionary/require (last visited Feb. 21, 2026).

## V. National Salvage Motion

National Salvage argues that the indemnification provision in the Salvage Contract is void under § 11-4.1 because, in its view, the Salvage Contract is a "contract relating to construction." However, for the reasons explained above, this argument is without merit.

Accordingly, because Norfolk's claims for indemnification under the Salvage Contract have yet to accrue, National Salvage's motion for summary judgment dismissing Counts III and IV is **denied without prejudice**.

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit.

For the foregoing reasons, Norfolk's motion for summary judgment on Counts I and II, to the extent it seeks a declaration that Nautilus owes Norfolk a duty to defend and breached that duty, is **granted.** Norfolk's motion for summary judgment on Count I, to the extent it seeks a declaration that Nautilus owes Norfolk a duty to indemnify, is **denied without prejudice**. Norfolk's motion for summary judgment on Counts III and IV against National Salvage is also **denied without prejudice**.

Nautilus's motion for summary judgment dismissing Counts I and II, to the extent those counts seek relief based on the

26

theory that it has no duty to defend, is **denied with prejudice.**
Nautilus's motion for summary judgment dismissing Count I, to
the extent that Count I seeks relief based on a duty to indem-
nify, is **denied without prejudice.**

National Salvage's motion for summary judgment dismissing
Counts III and IV is **denied without prejudice.**

The Clerk is directed to close all pending motions in this
case.

SO ORDERED.
Dated:    New York, New York
          March 16, 2026

_____
John G. Koeltl
United States District Judge